UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

DARLA BRANDON,                          )
                                        )
                Plaintiff,              )
                                        )
v.                                      )      Case No. 11-CV-0178-CVE-TLW
                                        )
THOMAS MOORE, PAWNEE COUNTY             )
SHERIFF, and PAWNEE COUNTY BOARD        )
OF COUNTY COMMISSIONERS,                )
                                        )
                                        )
                Defendants.             )

## OPINION AND ORDER

Now before the Court are the Motion for Summary Judgment of Defendant Thomas Moore and Supporting Brief (Dkt. # 47), Defendant Pawnee County Sheriff's Motion for Summary Judgment and Brief in Support (Dkt. # 49), and Defendant Board of County Commissioners of Pawnee County, Oklahoma's Motion for Summary Judgment and Brief in Support (Dkt. # 50).

## I.

This case arises out of an encounter that occurred on July 7, 2010, between plaintiff Darla Brandon and defendant Thomas Moore (Moore), a deputy sheriff with the Pawnee County Sheriff (Sheriff). At approximately 11:00 p.m. that night, Moore was patrolling Jennings, Oklahoma when he noticed an occupied car, parked parallel to the road, in a gravel parking lot in front of a vacant building. The property across from the parked vehicle was also vacant. There was no one on the

street and no businesses were open in the area at that time of night. Dkt. # 47-7 at 11, 14.[1]  When Moore noticed the parked vehicle, he observed that the engine was running, the headlights were on, and the vehicle was parked a few feet from an exposed air conditioning unit. Id. at 7; Dkt. # 47-14 at 4.

At the time of the incident, Moore was aware that there had been a series of thefts during 2009 and 2010 involving air conditioners in Pawnee County.  In the course of these thefts, the perpetrators would either steal the entire air conditioning unit or break it open and steal the metal parts from inside the unit. The Sheriff, the Undersheriff, and the Chief Deputy had all specifically advised the Sheriff's deputies to be on the lookout for air conditioner theft. Dkt. # 47-5 at 4; Dkt. # 47-8 at 6; Dkt. # 47-10 at 4.  Moore stated that, upon seeing the parked car, he "pulled over to check on her because it was [a] suspicious location" and "I wanted to know what she was doing, because of the rash of [air] conditioner thefts that were going on in the area." Dkt. # 47-11 at 4-5.

The parked car was occupied by plaintiff, who had pulled over to complete a telephone call because she tends to lose cellular telephone service between that location and her house.  Moore pulled his vehicle behind plaintiff's vehicle and activated his emergency lights so that plaintiff would know that he was a law enforcement officer. Dkt. # 50-6 at 5.  Before exiting his vehicle, Moore contacted the Sheriff's dispatch by radio and stated that he was "out with a vehicle." Dkt. # 47-13 at 2; Dkt. # 50-6 at 6; Dkt. # 50-15 at 4, 14.  The radio log shows that Moore made this radio

---

[1]     In her response to Moore's motion, plaintiff disputes that there were no businesses open in the area that night.  Dkt. # 57 at 8.  The only evidence relied on for this assertion is plaintiff's husband's testimony that a nearby video rental store "is open late sometimes." Dkt. # 57-1 at 3.  However, plaintiff testified in her deposition that she did not believe there were any businesses open at the time of the incident. Dkt. # 47-7 at 14.

call at 11:04 p.m.  Dkt. # 47-13 at 2.  Moore then exited his car and approached the driver's side window of plaintiff's car.

The exact content of the verbal exchange that took place at this point is disputed.  Plaintiff alleges that before Moore could say anything, she said "I'm okay, I'm just sitting here talking on the phone, I am about -- I'm ready to go home now."  Dkt. # 47-7 at 17.  Plaintiff alleges that Moore responded, "What, go home?  How do I know you ain't nothing but a thief?"  Id.  Plaintiff then asked Moore, "Is it not okay to be pulled over to talk on the phone?"  Dkt. # 47-14 at 4.  Moore recalls this conversation as being different in tone.  Moore states that when he approached the vehicle, plaintiff said "What, is it fucking illegal to talk on the phone?"  Dkt. # 47-4 at 8.  Moore replied that "We've had a rash of air conditioning thefts in this area" to which he says plaintiff responded, "Are you calling me a fucking thief?"  Id. at 9.

Regardless of the exact words of the conversation, the parties agree that Moore asked plaintiff for her driver's license and insurance verification, and plaintiff voluntarily handed the documents to him.  Dkt. # 47-15 at 3.  Plaintiff also admits that she became angry during the exchange.  Dkt. # 47-7 at 18.

Moore took plaintiff's documents back to his vehicle to check the validity of plaintiff's license and to determine whether there were any outstanding warrants for her arrest.  Moore contacted dispatch to perform the check on plaintiff's license, but he had to wait for a response because dispatch was assisting another deputy who was making arrests of several intoxicated

individuals.  Dkt. # 47-1 at 8; Dkt. # 47-8 at 5.[2]  When he was able to get through to dispatch, Moore

was informed that plaintiff's license was valid and that there were no outstanding warrants for her

arrest.  Moore testified that running plaintiff's license had "taken longer than [he] wanted it to" and

he was "trying to hurry it along."  Dkt. # 47-4 at 15.

Moore decided at this point to telephone his supervisor to ask whether he could release

plaintiff without writing a written contact report.  Moore had previously been informed by his

supervisor to write written contact reports for all contacts.  Dkt. # 47-1 at 9.  However, because he

had already detained plaintiff longer than he would have liked, Moore sought permission to let

plaintiff go without writing a report.  While Moore was waiting for his supervisor to answer the

telephone, plaintiff exited her vehicle and approached Moore's vehicle.

The parties have differing versions of what followed.  Plaintiff states that she approached

Moore's vehicle at a normal pace, and  Moore exited his vehicle and yelled at her "a couple of

times" to get back into her car.  Dkt. # 47-7 at 19-21.  Plaintiff states that she was merely attempting

to ask Moore whether she could go home.  Dkt. # 47-14 at 5.  Plaintiff alleges that she stopped

moving toward Moore when she was approximately half a car length away from him.  Dkt. # 58-3

at 15.  In Moore's version of the encounter, plaintiff moved toward him at a brisk pace and said

---

[2]     In her response to Moore's motion, plaintiff disputes that Moore had to wait for an answer
from dispatch, arguing that the radio log "shows that Defendant Moore submitted his request
for [a] warrants check of Mrs. Brandon before Deputy Chief Stout submitted his request."
Dkt. # 57 at 9.  However, the radio log and the undisputed testimony show that Moore's
initial radio contact at 11:04 p.m. occurred <u>before</u> he exited his vehicle.  Dkt. # 47-13 at 2;
Dkt. # 50-6 at 6.  Deputy Chief Stout's call to dispatch was logged at 11:05 p.m.  Dkt. # 47-
13 at 2; Dk. # 50-15 at 4.  Thus, it is reasonable to infer that when Moore returned to his
vehicle to run plaintiff's information, dispatch was already occupied with the other call.
Plaintiff has not submitted any evidence to refute Moore's testimony that he had to wait
because dispatch was occupied with Deputy Chief Stout.

"Give me back my fucking license. I'm going home." Dkt. # 47-4 at 18-19. Moore states that he ordered plaintiff to go back to her car approximately five times and told her at least three times that she would be arrested if she did not comply. Id. at 21-22. In response, Moore says that plaintiff continued to move toward him, "continued to yell profanities," and kicked her feet and moved her arms "in a frenzy fit." Dkt. # 47-1 at 11. Moore could not tell whether plaintiff had a weapon and he believed that his safety was being compromised. Dkt. # 47-4 at 19-20. Moore states that plaintiff "got within six inches of [his] face." Dkt. # 47-1 at 12. Despite the parties' different accounts of the interaction, plaintiff does not dispute that Moore ordered her to get back into her car and that she did not comply. Dkt. # 47-15 at 4-6.

The parties agree that Moore then grabbed plaintiff's right forearm or wrist with his right hand and applied an "arm bar" maneuver, spinning plaintiff away from him and grabbing hold of plaintiff's elbow with his left hand. Dkt. # 50-5 at 23-24. Plaintiff jerked away from Moore and said that she was not going anywhere with him. Dkt. # 47-7 at 25-26. Moore was able to grab plaintiff's arm and put her in handcuffs. Plaintiff alleges that Moore then "slammed" her down on the hood of the car. Id. at 25. Moore disputes this allegation. Dkt. # 50-5 at 24. Moore attempted to get plaintiff into the back of his vehicle, but plaintiff continued to resist, tried to get away from Moore, and again said she was not going anywhere with him. Dkt. # 47-7 at 27. Moore was ultimately able to get control of plaintiff and place her in the back seat of his vehicle. Moore alleges that when he was placing plaintiff in the back seat of the car, plaintiff began to kick violently and kicked him in the jaw. Dkt. # 47-16 at 3. Plaintiff disputes that she kicked Moore. Moore then put in a call to dispatch to state that he had arrested plaintiff. This radio call was logged at 11:10 p.m. Dkt. # 47-13 at 2.

5

At some point, either during the scuffle between plaintiff and Moore, or once plaintiff was secured in the back seat of the vehicle, plaintiff complained to Moore that she had had gall bladder surgery five days prior and that her side was hurting.  Moore requested that first responders come to the scene to check plaintiff's health.  In addition to first responders, two emergency medical technicians arrived at the scene.  Three of these medical personnel examined plaintiff's surgery sutures and took her blood pulse rate through a finger monitor.  The medical personnel determined that plaintiff did not need emergency medical care.  Dkt. # 47-7 at 30-31; Dkt. # 50-7 at 8; Dkt. # 58-3 at 19.

Plaintiff was taken to the Pawnee County Jail and booked on charges of obstructing an officer, resisting arrest, and assault and battery on a police officer.  Dkt. # 47-16 at 3.  Plaintiff was placed in a cell at some point after 1:44 a.m. on July 8, 2010.  Dkt. # 58-3 at 20-21.  Plaintiff alleges that she filled out a form requesting further medical attention because she was in pain, but that the form was never taken from her.  Id. at 20.  Plaintiff asked for her medication, which had been in her handbag, but jail personnel told her that they could not dispense medication until 5:00 a.m.  Id. at

21.  Plaintiff was given a dose of her medications at 5:00 a.m on July 8, 2010.  Id. at 21.  Plaintiff was ultimately released from jail later that morning.[3]

On March 24, 2011, plaintiff filed this action.  The first amended complaint (Dkt. # 13) alleges the following specific claims for relief:  (1) a 42 U.S.C. § 1983 action for unreasonable arrest and excessive use of force in violation of the Fourth, Fifth, and Fourteenth Amendments against Moore; (2) a 42 U.S.C. § 1983 action for unreasonable arrest and excessive use of force in violation of the Fourth, Fifth, and Fourteenth Amendments against the Sheriff; and (3) a state law tort claim against the Board of County Commissioners for Pawnee County (the Board).

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(a) mandates

---

[3]   While it is not material to the pending motions, the Court notes that plaintiff was never charged in court with any offenses arising out of this incident.  However, Moore was charged with and tried for assault, battery, and false arrest.  Dkt. # 50-11 at 4.  Moore was acquitted of all charges.  Id.; Dkt. # 49-6 at 10.  The record is replete with vague references to small town politics that may be the cause of the decision not to charge plaintiff and to charge Moore.  The record reveals that, prior to becoming a deputy sheriff, Moore was the police chief for the City of Jennings.  Dkt. # 49-3 at 2.  Moore's performance as police chief was criticized by many citizens of Jennings, and Moore had argued about this situation with former Jennings Mayor Roy Martin Nichols.  Dkt. # 59-2 at 3-4.  Nichols was also one of the first responders to the scene of the July 7, 2010 incident with plaintiff.  Dkt. # 50-12 at 3.  Plaintiff appears to have had some sort of relationship with Nichols, as she refers to him in her deposition by the nickname "Marty," and he refers to her by her first name in his deposition.  Dkt. # 47-7 at 29; Dkt. # 50-12 at 3.  Finally, during her ride to the county jail, plaintiff told Moore and the other deputy riding in the vehicle that she had a cousin who is a highway patrol trooper, that she was the best friend of "the Judge's" wife, and that this incident would be "the talk of the town."  Dkt. # 50-6 at 18l; Dkt. # 50-15 at 7.

the entry of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

**A.     Moore's Motion for Summary Judgment**

Plaintiff asserts a claim for relief under 42 U.S.C. § 1983 against Moore  for unreasonable seizure, unreasonable arrest, excessive force, deprivation of life, liberty, and property without due process of law, and violation of plaintiff's right to equal protection of the laws. Section 1983 provides a cause of action against state actors for violation of a plaintiff's Constitutional rights.

8

Becker v. Kroll, 494 F.3d 904, 913 (10th Cir. 2007).  To succeed on a claim under § 1983, a plaintiff must prove two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Anderson v. Suiters, 499 F.3d 1228, 1232-33 (10th Cir. 2007).  "The core inquiry under any § 1983 action . . . is whether the plaintiff has alleged an actionable constitutional violation."  Becker, 494 F.3d at 914.

Plaintiff alleges that her seizure and arrest by Moore were in violation of her Fourth Amendment rights.  The Fourth Amendment to the Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  In determining whether a seizure comports with the Fourth Amendment, the Tenth Circuit has identified three categories of police-citizen encounters:  "(1) consensual encounters which do not implicate the Fourth Amendment . . . (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity . . . and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause."  United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996) (internal citations omitted).  These categories are not static; a consensual encounter can escalate into an investigative detention, and an investigative detention can escalate into an arrest. United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996).  The Court must analyze each step of the encounter and determine whether the requisite level of suspicion is present.  Id. The "ultimate determination of reasonableness under the Fourth Amendment is a question of law."  United States v. King, 990 F.2d 1552 (10th Cir. 1993).

The first phase of plaintiff's interaction with Moore was a consensual encounter that does not implicate the Fourth Amendment. "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." Florida v. Bostick, 501 U.S. 429, 439 (1991). "Police officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures." United States v. Johnson, 364 F.3d 1185, 1188-89 (10th Cir. 2004). Moore did not need probable cause or reasonable suspicion to approach plaintiff's vehicle and ask her for her identification. It is undisputed that plaintiff voluntarily gave Moore her identification.[4] Thus, this initial interaction did not violate plaintiff's Fourth Amendment rights.

The parties agree that, once Moore took plaintiff's identification back to his vehicle, the encounter escalated into an investigative detention for which reasonable suspicion was necessary. Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted). Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Alcaraz-Arellano, 441 F.3d 1252, 1260 (10th Cir. 2006) (internal quotations omitted). The investigative stop must also be "reasonably related in scope to the circumstances which justified the interference." King, 990 F.2d at 1557. When conducting an investigative detention based on reasonable suspicion, "the officer may briefly detain the individual in order to determine his identity

_____

[4]   In her response to Moore's motion, plaintiff states that Moore "demanded" that she surrender her license. Dkt. # 57 at 17. However, the summary judgment record contains no evidence of such a "demand." To the contrary, plaintiff testified that Moore "asked me for my Driver's License, and I gave that to him, and he asked me for my insurance verification, and I gave that to him." Dkt. # 47-15 at 3.

or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000) (internal quotation omitted).  The Tenth Circuit has held that "as long as [police have] a particularized and objective basis for suspecting an individual may be involved in criminal activity, [they] may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality."  Johnson, 364 F.3d at 1194.

In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances.  United States v. Arivizu, 534 U.S. 266, 274 (2002); Johnson, 364 F.3d at 1189 ("the reasonableness of the officer's suspicions is judged by an objective standard taking the totality of the circumstances and information available to the officers into account") (internal quotations omitted).  In considering the totality of the circumstances, it is proper for the Court to consider, among other factors, the individual's demeanor, the nature of the location, and the time of day.  See Oliver, 209 F.3d at 1187;  Johnson, 364 F.3d at 1192-93.

Construing the facts in the light most favorable to plaintiff, the Court finds that particularized factors created reasonable suspicion that criminal activity was afoot.  First, plaintiff was pulled over in a mostly deserted area late at night.  Second, plaintiff was parked near an exposed air conditioner unit with her engine running.  Third, Moore knew that air conditioner theft was a problem in the area and had been told to be on the lookout for such theft.  Fourth, plaintiff appeared angry when questioned by Moore.  When considered in totality, these undisputed facts clearly substantiate

Moore's reasonable articulable suspicion that plaintiff was engaged in criminal activity.[5] Therefore, Moore was justified in briefly detaining plaintiff in order to determine her identity.

Plaintiff argues that the "scope and duration" of the investigative detention "exceeded permissible constitutional boundaries." Dkt. # 57 at 19. While plaintiff does not elaborate on this argument, the argument appears to be based on plaintiff's allegation that Moore took an unreasonable amount of time to check her identity. "An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004). However, "there is no absolute rule for determining how long an investigative detention may continue before it becomes unreasonable under the Fourth Amendment." Id. at 1150. The radio log of the Sheriff shows that Moore's initial radio call before he exited his vehicle was at 11:04 p.m., while his radio call stating that he had arrested plaintiff occurred at 11:10 p.m. Dkt. # 47-13 at 2. Thus, the radio log shows that the entire investigative detention lasted no longer than six minutes, which the Court finds is not an unreasonable amount of time. Plaintiff has not presented any evidence to refute the information contained in the radio log. Plaintiff testified that she believed the encounter could have lasted up to twenty minutes and that there was "no way" it could have been only six minutes. Dkt. # 50-8 at

---

[5]     Plaintiff argues that these particularized factors did not create reasonable suspicion because they were not "mentioned in the probable cause affidavit [Moore] drafted soon after he arrested the Plaintiff on July 7, 2010." Dkt. # 57 at 18. Plaintiff is correct that the probable cause affidavit did not specifically mention all of these factors, but states that Moore stopped "to check on the driver and see if anything was wrong." Dkt. # 47-16 at 2. However, the probable cause affidavit was written by Moore in order to show probable cause for her arrest, not to show reasonable suspicion for her investigatory detention. As noted above, no probable cause was necessary to conduct the investigative detention. The fact that Moore did not articulate his reasonable suspicion for initially detaining plaintiff in the probable cause affidavit does not negate the undisputed facts that led to that reasonable suspicion in the first place.

6-7.  However, plaintiff conceded that it "if you are sitting and waiting, time moves more slowly than normal." Id. at 7.  Even if the initial detention had lasted up to twenty minutes, the Court would find that Moore did not take an unreasonable amount of time to check plaintiff's identification, especially in light of the undisputed testimony that other radio traffic had to be dealt with before Moore could get through to dispatch.  See Shareef, 100 F.3d at 1501 (holding that, given totality of circumstances, where evidence showed computer was down and/or slow, thirty minutes was reasonable time for investigative detention).  Furthermore, Moore's telephone call to his supervisor did not unreasonably delay the detention, as it would not have resulted in a substantial amount of additional time.

Having determined that Moore did not violate plaintiff's Fourth Amendment rights when he detained her, the Court turns to the constitutionality of plaintiff's arrest.  Moore argues that once plaintiff exited her vehicle, approached him, and refused to comply with his direction to return to her car, Moore had probable cause to arrest plaintiff for:  (1) obstructing an officer in the discharge of his duty in violation of OKLA. STAT. tit. 21, § 540; and (2) resisting an officer in the performance of his duty in violation of OKLA. STAT. tit. 21, § 268.  Plaintiff argues that she did not commit any illegal act for which she could be arrested.  Dkt. # 57 at 21.

"Generally, a warrantless arrest is constitutionally valid when an officer has probable cause to believe that the arrestee committed a crime." Stearns v. Clarkson, 615 F.3d 1278, 1282 (10th Cir. 2010).  "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested." United States v. Martin, 613 F.3d 1295, 1302 (10th Cir. 2010).  "[P]robable cause must be evaluated in light of the circumstances as they would have appeared to a prudent, cautious, trained police officer." United

13

States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001).  The Supreme Court has held that it is constitutionally reasonable for a police officer to arrest a person for even a minor offense if the officer has probable cause to believe that the person has committed a crime.  Virginia v. Moore, 553 U.S. 164, 171 (2008).

Viewing the facts in the light most favorable to plaintiff, the Court finds that Moore had probable cause to arrest plaintiff for obstructing an officer.  OKLA. STAT. tit. 21, § 540 provides: "Every person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his office, is guilty of a misdemeanor."  The question before the Court "is not whether [plaintiff] was actually obstructing or interfering . . . but rather whether an objectively reasonable officer could conclude that [plaintiff] was violating the Oklahoma statute." United States v. Christian, 190 Fed. Appx. 720, 723 (10th Cir. 2006) (unpublished).[6]  It is undisputed that plaintiff exited her vehicle while Moore was attempting to contact his supervisor to determine if he had to issue a written report.  Moore testified that, based on his training and in order to protect his safety, he does not allow anyone to approach his vehicle.  Dkt. # 47-1 at 9.  In order not to be "caught sitting down" in his car, Moore exited his vehicle and ordered plaintiff to go back to her vehicle. Id.  It is undisputed that Moore repeatedly told plaintiff to return to her vehicle.  Moore testified that he did not attempt to arrest plaintiff until she was close enough to reach his weapon and that, even as she drew near, he could not determine whether plaintiff had a weapon.  Dkt. # 50-5 at 19-21. Moore was justified in ordering plaintiff to return to her car in an attempt to gain control of the situation.  "It is beyond dispute that the safety of law enforcement officers during the performance

---

[6]     This and other unpublished decisions are cited for their persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

of their duties is a legitimate and weighty concern." Novitsky v. City of Aurora, 491 F.3d 1244,

1254 (10th Cir. 2007) (internal quotation omitted).  It is undisputed that plaintiff refused to return

to her car and continued to walk toward Moore.  A reasonable officer in this situation could have

concluded that plaintiff was interfering with his duties by preventing him from contacting his

supervisor in order to complete the investigative detention and by obstructing his efforts to secure

the safety of the scene.  Thus, Moore had probable cause to arrest plaintiff.  See Trent v. State, 777

P.2d 401, 402-03 (Okla. Crim. App. 1989) (holding probable cause existed to arrest plaintiff for

obstruction where she had been repeatedly advised to leave the scene); cf. United States v. Johnson,

33 Fed. Appx. 485, 486 (10th Cir. 2002) (holding that sufficient evidence existed to convict

defendant of obstruction where defendant refused to comply with officer's instructions and impeded

officer's efforts to handcuff him) (unpublished).

 In light of the  finding that probable cause existed to arrest plaintiff for obstruction, the Court

need not address whether there was probable cause to arrest plaintiff for resisting arrest or for assault

and battery of a police officer.  See Howards v. McLaughlin, 634 F.3d 1131, 1141 (10th Cir. 2011)

("[a]n arrest is not invalid under the Fourth Amendment simply because the police officer

subjectively intended to base the arrest on an offense for which probable cause is lacking, so long

[as] the circumstances, viewed objectively, justify the arrest."); Goings v. City of Pittsburg, No. 11-

4056-SAC, 2011 WL 4093440, at *7 (D. Kan. Sept. 14, 2009) (holding that, if an officer has

probable cause to arrest a suspect fo any crime, there is no Fourth Amendment violation even if the officer lacked probable cause with respect to the actual offense charged).[7]

Plaintiff next argues that Moore violated her Fourth Amendment rights by using excessive force.  In analyzing claims of excessive force, the Court considers "whether the force used to effectuate an arrest violates an individual's Fourth Amendment rights under the objective reasonableness standard of the Fourth Amendment."  Marquez v. City of Albuquerque, 399 F.3d 1216, 1220 (10th Cir. 2005) (internal quotations omitted).  "While the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, that degree is not unlimited."  Chidester v. Utah County, 268 F. Appx. 718, 726 (10th Cir. 2008) (unpublished).  "The ultimate question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them."  Cavanaugh v. Woods Cross City, 625 F.3d 661, 664 (10th Cir. 2010).  "To guide this inquiry, the Supreme Court has delineated three, non-exclusive factors: 1) the severity of the crime at issue; 2) whether the

---

[7]     While neither party fully briefed the issue, the first amended complaint appears to allege that plaintiff's Fourth Amendment rights were violated when Moore conducted a search of her vehicle after arresting her.  See Dkt. # 13 at 5; see also Dkt. # 57 at 10.  Moore testified that he had plaintiff's car impounded pursuant to policy not to leave a car unattended. Dkt. # 57-6 at 18-19.  Before having the car impounded, Moore conducted an inventory search of the vehicle "to get a complete list of anything of value that's in that vehicle" in order to create a record that "it was there at the time that it was impounded." Id. at 18.  A search of an individual's vehicle or belongings for purposes of inventorying the contents subsequent to arrest is a long-acknowledged exception to the warrant requirement.  See United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992).  Such an inventory search "does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the [property] and its contents.'" Id. (citing South Dakota v. Opperman, 428 U.S. 364, 369 (1975)).  Plaintiff has not presented any evidence that the impoundment and the inventory search were not standard procedure in these circumstances or that the search was conducted for any purpose other than to protect the property.  Thus, plaintiff has not shown that the inventory search violated her constitutional rights.

16

suspect poses an immediate threat to the safety of the officers or others; and 3) whether he is actively resisting arrest or attempting to evade arrest by flight."[8] Herrera v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 361 F. Appx. 924, 928 (10th Cir. 2010)(unpublished) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).

Viewing the evidence in the light most favorable to plaintiff, Moore executed an arm bar maneuver by grabbing plaintiff's wrist, turning her around, handcuffing her, and slamming her (plaintiff's version) against the hood of his car.  It is undisputed that plaintiff actively resisted Moore's efforts, including at one point pulling away from him.  Although plaintiff's offense was a misdemeanor, her active resistance and effort to flee warranted a degree of force necessary to restrain her and protect the safety of the officer.  See Novitsky, 491 F.3d at 1254 ("Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground."); Gallegos v. City of Colo. Springs, 114 F.3d 1024, 1031 (holding that the use of an "arm bar maneuver" and "take-down" of an individual was reasonable to protect the safety of two officers in light of the individual's "strange and aggressive conduct").  There is no allegation that Moore slammed plaintiff into the hood of the car in any way that is not consistent with his effort to gain control over her and handcuff

_____

[8]     Moore argues that plaintiff cannot recover on her excessive force claim because she has not shown any actual non-de minimis injury. Dkt. # 47 at 26-27.  However, the cases cited by Moore involved allegations of excessive force based on injuries sustained from tight handcuffs. See, e.g., Cortez v. McCauley, 478 F.3d 1108 (10th Cir. 2007).  Moore has not cited any legal authority showing that the Tenth Circuit has extended this rule to cases alleging injuries other than those sustained from handcuffs. See Vondrak v. City of Las Cruces, 535 F.3d 1198, 1208 (10th Cir. 2008) ("We have consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims. . . . Nevertheless, when an excessive force claim relies upon unduly tight handcuffing, we have held that the plaintiff must show 'some actual injury.'") (internal citations omitted).

her as she resisted.  There are no facts on which a reasonable jury could base a finding that Moore used anything other than objectively reasonable force under the circumstances.

Even if this Court were to find that there was a question of fact as to whether Moore used excessive force, Moore would still be entitled to summary judgment based on the defense of qualified immunity.  When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who "is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez, 478 F.3d at 1128.  The second step of the requisite inquiry turns on "whether it would be clear to a reasonable [officer] that his conduct was unlawful in the situation he confronted."  Hobbs v. Zenderman, 579 F.3d 1171, 1183 (10th Cir. 2009).  Plaintiff presents no case authority, nor any argument based on the facts and evidence of record, to show that Moore could not have reasonably believed his use of force was warranted by the circumstances.  Plaintiff does not dispute that she was actively resisting efforts to handcuff her and attempted to get away from Moore.  Therefore, the Court finds that Plaintiff has failed to show Moore used a clearly unreasonable degree of force to effectuate her arrest.

Plaintiff also asserts a claim against Moore for violation of her Fifth and Fourteenth Amendment rights to be protected against deprivation of liberty and property without due process. Claims involving arrests and other seizures are governed by the Fourth Amendment, which secures the right against unreasonable seizures, and not the Fifth or Fourteenth Amendment.  See Albright v. Oliver, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for

18

analyzing these claims.") (internal quotation marks and citation omitted).  Plaintiff has not alleged conduct by Moore that is prohibited by some constitutional provision other than the Fourth Amendment.  Plaintiff's allegations are properly analyzed under the reasonableness standard of the Fourth Amendment, rather than the Fifth or Fourteenth Amendments.  Plaintiff has not cited any legal authority to the contrary.

Finally, the first amended complaint asserts a violation of plaintiff's right to equal protection of the laws as guaranteed by the Fourteenth Amendment.  However, the first amended complaint does not allege, nor does the summary judgment record disclose, any factual basis for a claim that plaintiff was a member of a protected class, or a "class of one," who was intentionally treated differently than other similarly situated individuals.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  Therefore, Moore is entitled to summary judgment on any equal protection claim asserted.

For the foregoing reasons, summary judgment is appropriate as to all claims against Moore.

**B.    Pawnee County Sheriff's Motion for Summary Judgment**

Plaintiff asserts a claim for relief under 42 U.S.C. § 1983 against the Sheriff for violations of her Fourth, Fifth, and Fourteenth Amendment rights.  It is well-settled law that a municipal employer, such as the Sheriff, may be held responsible "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. New York City Dep't of Social Services, 436 U.S. 658, 694 (1978).  In order to hold the Sheriff liable under § 1983, plaintiff must first present evidence of an underlying constitutional violation and then plaintiff must present evidence that the Sheriff was responsible for that violation. See e.g., Hinton v. City of Elwood, 997 F.2d 774 (10th

19

Cir.1993).  Because the Court has found no constitutional violation, plaintiff's claim against the

Sheriff necessarily fails.[9]  See Cummisky v. Mines, 248 Fed. Appx. 962, 967 (10th Cir. 2007)

(unpublished) (affirming grant of summary judgment to municipality where no constitutional rights

were violated).

### C.    Pawnee County Board of County Commissioners Motion for Summary Judgment

The first amended complaint alleges a state law tort claim against the Board for the negligent

acts of its employees. (Dkt. # 13 at 10). However, the Court has disposed of all claims over which

it has original jurisdiction.   Under 28 U.S.C. § 1367(c), a federal district court may decline

supplemental jurisdiction when it has "dismissed all claims over which it has original jurisdiction."

The Court recognizes that it has discretion to retain jurisdiction over a pendent state law claim in

some circumstances.  United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966).  However,

"if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional

sense, the state claims should be dismissed as well."  Id. at 726; see also United States v. Botefuhr,

309 F.3d 1263, 1273-74 (10th Cir. 2002) ("a district court should normally dismiss supplemental

state law claims after all federal claims have been dismissed, particularly when the federal claims

are dismissed before trial").

The Court has found that summary judgment should be entered in favor of Moore and the

Sheriff on plaintiff's federal law claims, and the sole surviving claim is a state law tort claim against

---

[9]     Even if there had been a constitutional violation, plaintiff has failed to show any liability of
the Sheriff under Monell.  Plaintiff has failed to present evidence of any custom or policy
of the Sheriff that led to the alleged constitutional violations.  Nor has plaintiff shown that
the Sheriff provided inadequate training that amounts to deliberate indifference to the
constitutional rights of individuals.  See Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir.
2003).

the Board under the Oklahoma Governmental Tort Claims Act (GTCA), OKLA. STAT. tit. 51, § 151 et seq.  The preferred procedure in such cases is to dismiss the state law claim without prejudice to refiling in state court.  See Sullivan v. Scoular Grain Co. of Utah, 930 F.2d 798, 803 (10th Cir. 1991); United Mine Workers, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties . . .").  This is especially true in light of the fact that disposition of plaintiff's claim involves construction of a state statute, as the Board argues that it is partially exempt from liability under to the GTCA.  Dkt. # 50 at 25-28.  The Court finds that, in the interests of comity and to promote justice, plaintiff's state law tort claim should be dismissed without prejudice; thus, the Board's summary judgment motion is moot.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment of Defendant Thomas Moore and Supporting Brief (Dkt. # 47) is **granted**, and  Defendant Pawnee County Sheriff's Motion for Summary Judgment and Brief in Support (Dkt. # 49) is **granted**.

**IT IS FURTHER ORDERED** that Defendant Board of County Commissioners of Pawnee County, Oklahoma's Motion for Summary Judgment and Brief in Support (Dkt. # 50) is **moot**.  The Court declines to exercise supplemental jurisdiction over plaintiff's state law tort claim. Plaintiff's state law tort claim against the Board is **dismissed without prejudice** to refiling in state court.

**DATED** this 21st day of February, 2012.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

21